HUGGINS et al. v. DALEY.

(Circuit Court of Appeals, Fourth Circuit. February 6, 1900.)

No. 325.

1. OIL LEASES—CONSTRUCTION—RIGHTS GRANTED.

By a course of decision in West Virginia which has established a rule of property, it is settled that an oil and gas lease in which the sole compensation to the lessor is a share of the product is not a grant of property in the oil or in the land until oil is actually produced, but merely of the right of possession for the purpose of exploration and development; and there is always an implied, if not an expressed, covenant for diligent search and operation.

2. SAME—RULES OF CONSTRUCTION.

A different rule of construction obtains as to oil and gas leases from that applied to ordinary leases or to other mining leases, and owing to the peculiar nature of the mineral, and the danger of loss to the owner from drainage by surrounding wells, such leases are construed most strongly in favor of the lessor.

3. SAME—CONDITIONS PRECEDENT—RIGHT OF FORFEITURE.

Where an oil and gas lease by which the lessor is to be compensated solely by a share of the product contains a proviso requiring the lessee to commence and complete a well on the property within a specified time, such proviso and the time of its performance are of the essence of the contract, and it constitutes a condition precedent to the vesting of any estate in the lessee, without regard to the grammatical construction of the instrument. When the lessee makes no attempt to comply with such provision, and evidences no intention to do so, at the expiration of the time stipulated the lease becomes forfeitable, at the option of the lessor, although by its terms it is for a definite term of years; and, being in possession, the exercise of such option is sufficiently evidenced by the lessor's execution of a new lease to another party.

4. SAME—CONSTRUCTION—EFFECT OF PENALTY FOR NONPERFORMANCE OF CONDITION.

A provision in an oil and gas lease, by the terms of which the lessor is to be compensated solely by a share of the product, that, in case of the failure of the lessee to comply with a condition requiring him to complete a well on the property within a stipulated time, he shall pay a forfeiture of $50, must be construed as providing a penalty intended to secure the performance of such condition, and not as an alternative condition; and where the lessee makes no attempt to fulfill the condition, and has no intention of doing so, he cannot, by a tender of the penalty, retain the lease in force until the expiration of its term, and thus secure an option on the property for speculative purposes. When, by his failure to comply with the condition, further performance of the contract becomes optional on his part, it is also optional on the part of the lessor.

Appeal from the Circuit Court of the United States for the District of West Virginia.

In Equity.

B. M. Ambler and A. Dewey Follett, for appellants.
V. B. Archer, for appellee.

Before SIMONTON, Circuit Judge, and PAUL and BRAWLEY, District Judges.

BRAWLEY, District Judge. This is an appeal from the circuit court of the United States for the district of West Virginia. The appellee filed a bill in equity alleging that one A. P. Hodges had obtained from F. P. Marshall a lease for oil and gas upon a certain tract of 50 acres of land situated in Ritchie county, W. Va., which had been assigned to him, and that subsequently said Marshall had leased the identical premises to J. J. and J. B. Huggins; and the prayer of the bill was that the said Huggins' and their associates should be restrained in prosecuting the work for developing said leasehold for oil, and that a receiver be appointed to take possession of said leasehold premises and operate the same, and that a decree should be entered canceling said lease as a cloud upon the title of the appellee.

Marshall was an illiterate farmer, the owner in fee of the tract of land described; and on March 12, 1897, he entered into an agreement, under seal, of which the substantial parts are as follows:

In consideration of one dollar paid by Hodges, the lessee, the lessor "does hereby grant. demise, and let unto the said lessee all the oil and gas in and under the following described tract of land, and also said tract of land for the purpose of operating thereon for oil and gas, with the right to use water therefrom, and all rights and privileges necessary or convenient for conducting said operations and the transportation of oil and gas, and waiving all rights to claim or hold any of the property or improvements placed or erected in and upon said land by the lessee as fixtures or as part of the realty."

Then follows the description of the land. The habendum clause is as follows:

"To have the same unto and for the use of the lessee, his executors, administrators. and assigns, for the term of 5 years from the date thereof, and as much longer as oil or gas is found in paying quantities thereon, not exceeding the term of 35 years from the date thereof; yielding and paying to the lessor the one-seventh part or share of all the oil produced and saved on the premises."

Then follows a further description of the method of delivering the oil into tanks, and a reservation of gas for the personal use of the lessor, and a proviso which is in the following terms:

"Provided, however, that a well shall be commenced upon the above-described premises within 30, and completed within 90, days from the date hereof; and, in case of failure to commence and complete said well as aforesaid, the lessee shall pay to the lessor a forfeiture of $50."

This lease was not recorded until April 8, 1898. At the same time was recorded an assignment of a half interest in said lease by Hodges to Daley, dated April 2, 1897, and acknowledged on April 4, 1898, and the assignment of the remaining half interest, dated April 2, 1898, and acknowledged April 4, 1898. The lease from Marshall to J. J. and J. B. Huggins was executed November 6, 1897, and recorded January 31, 1898.

Much testimony was taken tending to show that at the time of the execution of the lease Marshall was under the impression that the lease was only for 90 days, and that he believed that the words "5 years" had been stricken from the printed form of the lease, and "90 days" written therein; and in the copy of the lease which was given to him by Hodges the words "5 years" were stricken out, and "90 days" substituted, but it appears that the substitution was not in the handwriting of Hodges. The proviso was in the handwriting of Hodges; the remainder of the lease being printed, with the exception of some interlineations. There was also testimony to the effect that Daley was a partner of Hodges, and that Hodges had taken the lease for the benefit of the Cairo Oil Company, and impeaching the bona fides of the assignment to Daley. The conclusions reached by us do not require the determination of these questions, if, indeed, they are properly before us. It is undisputed that nothing was done by Hodges towards boring the well. It is clear from the testimony that he had no intention at any time to bore the well within the 90 days stipulated, and that he had not the means to do so if he had any such intention. In November following the execution of the lease to Hodges, the appellants leased from one Moore the land adjoining Marshall's for the purpose of operating for oil, and began to bore a well within 100 feet of Marshall's line, and about the same time they leased the land of Marshall for the purpose of operating for oil. At the time they took this lease they had knowledge that Hodges had some claim upon the land, and Marshall exhibited to them what purported to be a copy of the Hodges' lease. In this copy, as above stated, the words "5 years" had been stricken out, and "90 days" substituted; and after submitting the copy to a lawyer, and being informed that the lease had no further validity, they commenced operations upon the Marshall land, and expended about $3,600 in the boring of a well. About the time they struck pay sand, and after the well upon the Moore land was flowing oil, on April 15, 1898, Daley filed his bill for injunction. Their lease had been recorded January 31st, and some time between that day and the filing of the bill, but after they had commenced operations, Daley came upon the land, and informed them that he had some claim thereto; but the Hodges' lease and assignment to Daley was not recorded until April 8th, 10 days before the filing of the bill.

The question for decision is whether the proviso in the Hodges lease constituted a condition precedent, and whether the failure of Hodges to do anything towards the boring of the well did not prevent the vesting of any rights under that lease. By the terms of that instrument the lessor granted to the lessee all the oil and gas in and under the land described, "and also the said tract of land for the purpose of operating thereon for oil and gas." By a course of decisions it is well settled in West Virginia that a lease of this character is not a grant of property in the oil or in the land, but merely a grant of possession for the purpose of searching for and procuring oil. The title is inchoate, and for the purpose of exploration only until the oil is found. If it is not found, no estate vests

in the lessee; and, where the sole compensation to the landlord is a share of what is produced, there is always an implied covenant for diligent search and operation. There is, perhaps, no other business in which prompt performance is so essential to the rights of the parties, or delays so likely to prove injurious,—no other class of contracts in which time is so much of the essence. There is no other branch of mining where greater damage is done by delay. Coal and precious metals lie either in horizontal veins or in pockets. They remain where they are until removed. Oil and gas are the most uncertain, fluctuating, volatile, and fugitive of all mining properties. They lie far below the surface, beyond the control of human will, and beyond the reach of any legal process, whence they may flow unrestrained if the owner of adjoining land bores a well down to the strata which holds them; and there is no law which can provide adequate, or indeed any, compensation for such results. This is a matter of common knowledge, and "courts will generally take notice of whatever ought to be generally known within the limits of their jurisdiction." Greenl. Ev. § 6. It furnished the ground upon which the plaintiff in this case asks the court, through a receiver, to bore the well which the lessee was required to bore within 90 days from the date of execution of the instrument under which he claims. The only consideration which moved the lessor to grant the lease was the prospective royalties from oil and gas, which could come only if the lessee complied with the terms of this proviso that required the boring of a well; for, while the sum of one dollar is technically a valuable, it is only a nominal, consideration. If the contention of the plaintiff is correct, the lessee, Hodges, or his assigns, could have waited the full term of five years without expending one dollar or moving a hand for the development of the leased property, meantime tying the hands of the owner of the land, forbidding him to make arrangement with any other persons for the explorations which the lessee undertook to make, and perhaps suffering irreparable injury from the drainage of his oil and gas. This is the contract which a court of equity is asked to enforce. It is a short view of the range of equitable principles. There are no precise technical words which distinguish conditions precedent or subsequent. Whether they are one or the other is a matter of construction, to be solved by ascertaining the intention of the party creating the estate. They are not determined merely by the structure of the instrument, or the arrangement of the covenants. Where mutual covenants go to the whole consideration on both sides, they are mutual conditions,—the one precedent to the other. 4 Kent, Comm. 144. Where the undertaking on one side is, in terms, a condition to the stipulation on the other (that is, where the contract provides for the performance of some act or the happening of some event, and the obligations of the contract are made to depend on such performance or happening), the conditions are conditions precedent. The reason and the sense of the contemplated transaction as it must have been understood by the parties, and is to be collected from the whole contract, determines whether this is so, or not, or it may be determined from the nature of the acts to be done, and

the order in which they must necessarily precede and follow each other in the progress of performance. But when the act of one is not necessary to the act of the other, though it would be convenient, useful, or beneficial, yet, as the want of it does not prevent performance, and the loss and inconvenience can be compensated in damages, performance of the one is not a condition precedent to performance by the other. The nonperformance on one side must go to the entire substance of the contract and to the whole consideration, so that it may safely be inferred as the intent and just construction of the contract that, if the act to be performed on the one side is not done, there is no consideration for the stipulation on the other side. New Orleans v. Texas & P. Ry. Co., 171 U. S. 334, 18 Sup. Ct. 875, 43 L. Ed. 178. "When one act is to be done by one party before another act, which is the consideration of it, is to be done by the other, the covenants are dependent, and the other is not bound to perform until the first act has been done, because the first act is a condition precedent to performance of the other; and, in all cases where covenants are dependent, they are in the nature of conditions precedent, and must be performed in the order of time in which performance is provided for in the covenant; and, in determining whether covenants are dependent or independent, the intention of the parties and the good sense of the case will be regarded, rather than the technical sense of the words used." Wood, Landl. & Ten. § 312.

In construing this agreement in the light of all the facts surrounding contracts of this nature, and of the considerations moving the grantor in its execution, we have no difficulty in determining that the boring of a well by the grantee was the whole consideration of the lease, that nonperformance went to the entire substance of the contract, that the word "provided" is an apt word of condition, that the grantee did not, and at the time he procured the lease did not intend to, comply with the condition which was a condition precedent to the vesting of any title in the leased lands. In cases of conditions precedent, the consideration is the performance of the thing stipulated to be done, not the promise.

But it is contended by the appellee that the clause providing a forfeit of $50 for failure to bore the well within 90 days provides full compensation for failure to perform the condition. As a matter of fact, the $50 was not paid or legally tendered; but, inasmuch as the grantor had declared a purpose not to receive the forfeit money, it will be treated as if it had been tendered. The question whether a sum of money stipulated to be paid is a penalty or liquidated damages is sometimes difficult of determination, there being no criterion of universal application. It depends upon a construction of the whole instrument, the intention of the parties, the nature of the act to be performed, and the consequences which would naturally flow from its nonperformance. In many of the cases where oil leases have come before the courts, the doing of a certain thing, or the payment of rental in lieu thereof, is stipulated in the contract in a way that justifies the conclusion that the parties have provided exact and just compensation by way of liquidated damages

for failure of performance in contracts, where parties stipulate in the alternative, and are free to choose. But where consequences likely to follow nonperformance are not measureable by any exact pecuniary standard, and the probable damage is out of all proportion to the amount agreed to be paid, this sum should be considered a penalty; and such we hold it to be in this case, where the sum of $50 is stated to be a forfeiture. It is in the nature of a security for the performance, and cannot be held to be liquidated damages for nonperformance.

In French v. Macale, 2 Dru. & War. 274, Lord St. Leonard thus states the doctrine which we hold to be applicable here:

"The general rule of equity is that if a thing be agreed upon to be done, though there is a penalty annexed to secure its performance, yet the very thing itself must be done."

And in Dooley v. Watson, 1 Gray, 414, Chief Justice Shaw says:

"Courts of equity have long since overruled the doctrine that a bond for the payment of money, conditioned to be void on the conveyance of land, is to be treated as a mere agreement to pay money. When the penalty appears to be intended merely as a security for the performance of the agreement, the principal object of the parties will be carried out."

If a party can show that he has done everything in his power, but, by unavoidable accident, by fraud, surprise, or ignorance not willful, has been prevented from executing his covenant literally, the courts will relieve him, especially where the case admits of compensation for his nonperformance, or the parties can be put in the same situation as if the condition had been performed; but no ground for equitable relief can be found in a case where the party has not only failed to perform the conditions upon which alone he obtained the execution of the contract, but where it is also clear that he never at any time intended to perform, or had the means to do so. "There is no more intrinsic sanctity in stipulations of contract than in other solemn acts of the parties, who are constantly interfered with by courts of equity upon broad principles of public policy, or the pure principles of natural justice. Where a penalty or forfeiture is designed merely as a security to enforce the principal obligation, it is as much against conscience to allow any party to pervert it to a different or oppressive purpose, as it would be to allow him to substitute it for the principal obligation." Story, Eq. Jur. § 1316.

The principles announced by this court in Foster v. Gas Co., 32 C. C. A. 560, 90 Fed. 178, govern and sustain the conclusion reached, although the precise point here determined was not involved. In that case the demise was for 10 years, and there was a covenant that a well should be completed within one year, and in case of failure the lessee was to pay 10 cents per acre per annum after the time for completing the well as specified. The lessee bored one well, which proved to be dry, and no further effort was made. The court says:

"The completion of the well saves the penalty. It does not amount to a fulfillment of the covenants. The consideration for this lease was the prospective rents and royalties the lessor would enjoy if the lessee, by diligent search could find oil and gas in paying quantities. If the lease failed to bind the

lessee to diligent search for oil or gas, it was without consideration, binding on neither party, and voidable at the pleasure of either."

Numerous cases were cited,—among them, those from West Virginia which this court held to lay down rules of property stating the controlling doctrine peculiar to mining leases in that state, which the federal courts would recognize and follow. This case fully establishes the doctrine that the consideration in leases of this character "evidently and clearly contemplates active operations upon the demised premises," and when, after one failure, no further effort is made, mere inaction on the part of the lessee may well be construed an abandonment of rights under his leases. The case of Steelsmith v. Gartlan, 45 W. Va. 27, 29 S. E. 978, 44 L. R. A. 107, was cited to sustain these conclusions. That was a lease to Knotts and Garber for oil purposes, providing certain royalties, with a stipulation that a well should be completed within one year; and the failure to do so rendered the lease null and void, unless the lessee should pay 25 cents per acre from and after the date stipulated for the completion of the well, when such payment should operate to extend the time for five years. No well was drilled, and the lessor, considering the lease forfeited, refused to accept the rent therefor. His lessee's executor, before the expiration of five years, executed a new lease to Gartlan, February 11, 1895, which required him to drill a well within one month, with stipulations for the payment of $50 per month for any delay in completing the well. The term was for five years, and there was a stipulation that a failure to comply with any of its stipulations should render it void. Gartlan drilled a well, but, not finding oil or gas in paying quantities, removed his derrick and tools, and left the premises. The land was leased in October, 1896, to Steelsmith, who forthwith commenced operations, and filed a bill to cancel the Gartlan lease, and Knotts and Garber filed a cross bill. The court held that there being no provision for any further operations after the first well, when completed, was nonproductive, "the contract is at an end as to both parties as soon as such first well is abandoned as unsuccessful"; quoting Oil Co. v. Fretts, 152 Pa. St. 451, 25 Atl. 732:

"A vested title cannot ordinarily be lost by abandonment in a less time than fixed by the statute of limitations, unless there is satisfactory proof of an intention to abandon. An oil lease stands on quite a different ground. The title is inchoate, and for the purpose of exploration only until oil is found. If it is not found, no estate vests in the lessee, and his title, whatever it is, ends whenever the unsuccessful search is abandoned."

The lessee in that case had complied with the covenant to bore a well, and the court says:

"He could not be compelled to put down another well, and, he not being bound, the lessor was not bound, either; for the only consideration left to him was the prospective oil royalties and gas rentals, which the lessee was in position to entirely defeat. Contracts unperformed, optional as to one of the parties, are optional as to both."

Again:

"Such leases are construed most strictly against the lessee, and favorable to the lessor. When a lease provides the mode, manner, and character of the search to be made, implications in regard thereto are excluded thereby, as re-

pugnant, and the demise, for the purpose of operating for oil and gas for the period of five years, is dependent on the discovery of oil and gas in the search provided for; and, if such search is unsuccessful, the demise fails therewith, as such discovery is a condition precedent to the continuance or vesting of the demise. The lessee's title, being inchoate and contingent, both as to the five-years limit and time thereafter, on the finding of oil and gas in paying quantities, did not become vested by reason of his putting down a nonproductive well."

While most of the cases cited have gone upon the ground of abandonment, the governing principle in all oil leases of the character under consideration is that the discovery and production of oil is a condition precedent to the continuance or vesting of any estate in the demised premises; that such leases vest no present title in the lessee, and if, at any time, the lessee has the option to suspend operations, the lease is no longer binding on the lessor because of want of mutuality; and, where the only consideration is prospective royalty to come from exploration and development, failure to explore and develop renders the agreement a mere nudum pactum, and works a forfeiture of the lease, for it is of the very essence of the contract that work should be done. And, the smaller the tract of land, the more imperative is the need for prompt and efficient drilling; for oil operations cumber the land, rendering it unavailable for agricultural purposes. The landowner is entitled to his royalty as promptly as it can be had. The danger of drainage from his small holding is increased by delay, and the resulting damage, not being susceptible of pecuniary measurement, is therefore not compensable. No such lease should be so construed as to enable the lessee who has paid no consideration to hold it merely for speculative purposes, without doing what he stipulated to do, and what was clearly in the contemplation of the lessor when he entered into the agreement. Leaving out the proviso which bound the lessee to diligent search and development, there is nothing in this lease which bound him to do anything whatever. The proof is clear that he never intended to drill the well within the time stipulated. This proviso was written by the lessee evidently for purposes of deception. He knew that the object of the lessor was to secure diligent search for oil, and he was "keeping the word of promise to the ear, and breaking it to the hope"; skillfully turning it into a mere speculative lease, binding the lessor and leaving himself free. It would be unconscionable to hold the lessor bound. "Law, as a science, would be unworthy of the name, if it did not, to some extent, provide the means of preventing the mischiefs of improvidence, rashness, blind confidence, and credulity, on one side, and a gross violation of the principles of morals and conscience, on the other." Story, Eq. Jur. § 1316.

In Oil Co. v. Marbury, 91 U. S. 593, 23 L. Ed. 328, the facts were, to some extent, the converse of those here; but Mr. Justice Miller comments on the fluctuating character and value of this class of property, and asserts the injustice "of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit," and referring to the distinction between real estate, whose value is fixed, says:

"The class of property here considered is subject to the most rapid, frequent, and violent fluctuations in value of anything known as property, and requires prompt action in all who hold an option whether they will share its risks or stand clear of them, [and that] no delay for the purpose of enabling the defrauded party to speculate upon the chances which the future may give him of deciding profitably for himself whether he will abide by his bargain or rescind it is allowed in a court of equity."

In a case like this no judicial proceeding was necessary to avoid the lease. The landlord, never having been out of possession, cannot re-enter upon himself; and it was held in Guffy v. Hukill, 34 W. Va. 49, 11 S. E. 754, 8 L. R. A. 759, and in many other cases, that any unequivocally expressed election to avoid, as by giving a new lease, avoids the one preceding.

In Iron Co. v. Trout, 83 Va. 397, 2 S. E. 713, the court says:

"No lease of land for a rent for a return to the landlord out of the land which passes can be construed to be intended to enable the tenant merely to hold the lease for the purpose of speculation, without doing and performing in connection therewith what the lease contemplated. Such a construction would, indeed, make all such contracts a snare for the entrapment and injury of the unwary landowner. A man buying and paying for land may do with it as he likes,—work it or let it lie idle. But a tenant to whom land passes for a specified purpose has no such discretion. He must perform what he stipulated to do."

A recent author says:

"The trend of the decisions touching questions of forfeiture arising out of oil and gas leases has been almost uniformly in favor of the lessor. Generally it is the lessee who is favored, and, after a substantial compliance by him with the terms of the contract, equity will not regard a technical breach. But with mining leases it is otherwise. This is due principally to the nature of the business of mining, and more especially oil mining,—to the temptation offered a shrewd operator to purchase at a nominal price the right to develop lands, the owner of which is ignorant of their real value, and then to hold them indefinitely, neither working them himself, nor permitting another to do so." "But a lessee, where the instrument presents a semblance of inequity or unfairness, will find that he has a thorny road to travel before a court of equity will sanction his claims." Bryan, Petroleum, 146.

We are of opinion, upon the whole case, that the exploration for and development of oil and gas was the sole consideration for this lease; that the proviso requiring the boring of a well within 90 days was a condition precedent to the vesting of any interest in the lessee, and that the forfeiture of $50 was intended merely as a penalty to secure the drilling of the well, and, if paid, would have been merely compensation to the landowner for the right of the lessee to possession during the 90 days, and such payment would not be so far a compliance with the conditions of the lease as to vest in the lessee a title in the leased premises for the period of five years; that after the expiration of 90 days from the date of the lease, there being no provision therein for any work to be done by the lessee in the development of the property, which was the sole consideration therefor, the lessor had the option to avoid it; that the inaction of the lessee during a period of 8 months, while operations were being commenced on adjoining land, calculated to drain the land of the lessor and irreparably injure him, fully justified his avoidance of the lease; and that the lease to Huggins and his associates was an unequivocal declaration of his intention to avoid it, and terminated

any inchoate right which Hodges could claim thereunder. The decree of the circuit court is reversed, and the case remanded, with instructions to restore the leased premises to the appellants, and that the receiver be directed to turn over to them any moneys in his hands as the result of his operations, after deducting whatever sum may have been actually and necessarily expended by him in the development of the same, and that the bill be dismissed, with costs.