TENNESSEE OIL, GAS & MINERAL CO. v. BROWN et al.

(Circuit Court of Appeals, Sixth Circuit.   July 15, 1904.)

No. 1,295.

1. MINES AND MINING — CONTRACT—CONSTRUCTION—TERMINATION—ABANDON-MENT.

A landowner, in consideration of one dollar, "as well as the agreements hereinafter mentioned," bargained, sold, and conveyed to plaintiff's assignor, his heirs and assigns, all the mineral, coal, iron ore, ore and potter's clay, and other minerals, etc., and all timber suitable for lumber on a certain farm described. The agreement required the grantee "to enter upon the land and make search for coal and other minerals," and, if they were found in such quantities as to justify him to work the same, then he was to pay $10 per annum after the completion of a certain railroad, and on request, until mining was commenced or during the continuance of the agreement, "to apply on the payment of rent of coal, iron ore, or other minerals, or oil first mined thereafter." There was no provision as to how long the agreement should continue, nor any stipulation as to when the grantee should commence to mine, or how long he should continue. Held, that such agreement did not constitute a conveyance of the minerals, timber, etc., to the grantee in fee, but constituted a mining lease, requiring the grantee to search for ores, etc., within a reasonable time.

2. SAME—EXPLORATION FOR MINERALS—EXTENT.

Where a mining lease required the grantee to make a search for minerals on the land within a reasonable time as a condition precedent to the right to take minerals discovered on the terms of payment specified, the duty of exploration included a search for all of the minerals named in the lease which might reasonably be expected to be found in the land, considering known geological conditions, to such an extent as would not only determine the presence or absence of minerals, but their commercial value, considering their abundance and accessibility.

3. SAME—ABANDONMENT.

Where a mining lease required the grantee to search for minerals within a reasonable time as a condition precedent to his right to take minerals from the land under the lease, his failure to make any search or examination, except a mere superficial one, of which the grantor had no notice, for a period of 15 years, entitled the lessor to treat the lease as abandoned.

4. SAME—TERMINATION—ELECTION.

Where a mining lease provided that the grantee might terminate the same at his election, the lease was terminable at the will of either party.

Appeal from the Circuit Court of the United States for the Eastern District of Tennessee.

This is a bill to remove a cloud from the title to a tract of mineral land situated in Scott county, Tenn. The land in question is wild mountain land, situated in the Cumberland Mountains, and has little or no value, save for its timber and minerals. The plaintiffs are in possession and claim title in fee through conveyance made by one Richard Slaven, under whom the defendants also claim the mineral interest in said lands. The alleged cloud consists in a

prior conveyance or agreement of lease or license made by said Richard Slaven to one Geo. W. Colbert under whom defendants claim the mineral and timber interests in said land. This instrument is in these words:

"The said party of the first part, for the consideration of one dollar, to him in hand paid, the receipt of which is hereby acknowledged, as well as the agreements hereinafter mentioned does hereby bargain, sell, and convey unto the party of the second part, his heirs and assigns, all the mineral, coal, iron ore, ore and potter's clay, and other minerals, and all rock or petroleum oil and salines, and all timber suitable for lumber, in, upon, or under the farm or tract of land in the district of No. 1st, in the county of Scott, in the said state of Tennessee, bounded and described as follows: * * * Granting to the party of the second part, or his assigns, the exclusive right to enter upon said lands at any time hereafter, and search for coal, iron ore, and all other minerals, oils, and salines, and, when found, to remove the same from said lands, together with all rights and privileges incident to the mining and securing said coal, iron ore, clay, and other minerals, oils, and salines, including the right of ingress and egress. And the party of the second part agrees to enter upon and make search for coal and other minerals in said lands above described; and should he find coal, iron ore, or other minerals, or oils, or salines, in said lands and adjoining lands, of sufficient thickness, quantity, and quality to justify him, the party of the second part, to open and work said mines, or oils, or salines, then he, or his representatives or assigns, shall pay to the party of the first part, his heirs or assigns, within five years after the completion of a railroad, built in connection with any leading railroad by which said minerals or oil can be taken to any large markets, the sum of ten (10) dollars a year, until mining is commenced upon said premises, or during the continuance of this agreement; and the failure to make these advance payments yearly upon request, shall be deemed an abandonment of this agreement, but not to the injury of the party of the second part, or his assigns. And the party of the second part shall have the right to abandon said lands and mining at any time and remove all his buildings and fixtures from said lands. And the said party of the second part, by himself or assigns, agrees to pay to the party of the first part, his legal representatives or assigns, the sum of ten (10) cents for each ton of (2,240 pounds) of screened coal, iron ore, or other minerals mined and removed from said lands herein described; and the price shall be ten (10) cents per 1,000 feet of sawed lumber; and the price or rent for rock or petroleum oil and salines shall be one-twentieth of the net proceeds. But it is understood and agreed that any advance payments of ten (10) dollars as before mentioned to be paid yearly, that shall be made to the party of the first part, are to apply on the payment of rent of coal, iron ore, or other minerals or oil first mined thereafter. The payment of rent per ton on coal, iron ore, other minerals, clays, oils, and salines, mined and removed, shall be made half-yearly, and all payments required by this agreement shall be made and accepted in bankable funds of the state of Tennessee. It is mutually understood by the parties that the coal, clay, and ore under any dwelling house or other permanent buildings upon the premises shall not be mined out, and as little injury to the surface of said land shall be done as possible, in the mining, removal, and transportation of said coal, clay, and ore, as herein contemplated. It is also mutually understood that the stipulations herein contained shall apply to and bind the heirs, executors, administrators, and assigns of the parties, respectively. In witness whereof, the parties hereunto set their hands and seals the day and year first above written."

Upon the pleadings and evidence, the prayer of the bill was granted, and a cancellation of the instrument above set out decreed.

H. H. Ingersoll and Wm. Wisner White, for appellant.

E. G. Foster, C. E. Lucky, Edward T. Sanford, and J. A. Fowler, for appellees.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

The contention of the appellant company is that the agreement be-

tween Richard Slaven and Geo. W. Colbert, set out in the statement of
the case, is a deed of conveyance of the minerals in the land and of the
timber thereon, which operated to vest a fee in the minerals and tim-
ber, subject to defeasance only upon breach of the agreement to pay
$10, upon request, annually, after the completion of the railroad re-
ferred to. This construction is based upon the insistence that the terms
"bargain, sell, and convey," found in the first clause of the instrument,
necessarily characterize it as a conveyance of the timber upon and the
minerals under the surface of the land of Slaven. Prima facie this
may be true. But before we give these words this construction we
must look into the four corners of the agreement and give effect to the
whole of the contract. The Cincinnati Southern Railroad was in pros-
pect when this contract was made, and was constructed to a point with-
in nine miles of this property within five years after this contract. But
no railroad has been built connecting that railway with this property,
and appellants say that they are not under covenant, implied or express,
to construct such connecting road. Without such road they say the
coal under this land cannot be profitably mined or the timber converted
into lumber, and that, having the title to the coal and timber, and the
title to any other minerals which may yet be found, they are under no
obligation to mine the coal or other minerals, or cut down the timber,
until it can be done to their advantage, and that they may hold this
estate until such time as it suits them to remove the minerals or oil or
timber, and that neither Slaven nor his subsequent lessees can complain
because the instrument contains no agreement, express or implied, ob-
ligating them to begin or continue mining, if they should choose to be-
gin. Though they have done nothing, and paid only the nominal con-
sideration of $1 under this deed, they justify this nonaction for 25 years
by the insistence that one may do as he will with his own, in the absence
of a contract to do a particular thing, and that, not having agreed to
mine the minerals upon said land, they are within their right in biding
their time, and that, if they shall deem it advantageous to ever com-
mence mining, they are under no covenant, implied or express, to mine
any definite quantity, or continually, or until the mineral is exhausted,
but may, if they see fit, "abandon said lands and mining at any time,
and remove all buildings and fixtures," having reserved the right to
terminate the estate vested at will.

The logic of the situation compels the learned solicitor for the ap-
pellants to take up this extreme ground, for otherwise their utter fail-
ure to do any valuable thing in pursuance of the agreement after the
lapse of 25 years would be unaccountable. If in all the time past they
have had the right to stand upon their claim to be the owners absolute-
ly of the mineral interests thus severed, in law, from the land, and to
refuse to develop and operate that interest, because that is the right of
an owner of the fee, the same right to hold onto this estate for the next
century is undeniable. That they may be required to pay $10 annually
if a railroad shall ever be constructed from the Cincinnati Southern to
this land they concede. But this concession is possibly inadvertent;
for, although one clause of the agreement does provide for such a
payment until mining commences, and that the failure to make these
advance payments yearly upon request shall be deemed an abandonment

of this agreement, it is added, "but not to the injury of the party of the second part or his assigns." If it is true that the appellants have for $1 acquired the right to prevent Slaven or his assigns from using, exploiting, or mining the mineral interests upon or under his own land, and can at no time be required to convert the timber into lumber, or to open and operate the very valuable vein of coal now known to underlie its surface, to say nothing of the possibilities of iron ore, coal oil, and other minerals, the contract is one of the most unreasonable and one-sided which any court has ever been called upon to uphold. But this $1 was not the real consideration moving to Slaven, for the recital of the contract is that the consideration is one dollar in hand paid, "as well as the agreements hereinafter mentioned." Now, what are these agreements referred to? for before we may conclude that this is an out and out conveyance in præsenti of the timber and mineral interests owned by Slaven, we must scrutinize the agreements which constitute the real consideration, for in the "agreements" we are most likely to find the purpose, intent, and meaning of the instrument regarded as a whole.

First. We find that Colbert agrees "to enter upon said land and make search for coal and other minerals." Why shall he agree to do this, if already he is the fee-simple owner of the minerals that may be hidden there? Second. If he finds such minerals, what then? The agreement provides that, if they are found in such quantity and quality as to "justify him, * * * to open and work same, * * * then" he shall pay $10 per annum, after the completion of the railroad mentioned, and upon request, "until mining is commenced, or during the continuance of this agreement." But how long is this "agreement" to continue? There is no stipulation that he shall ever commence to mine, or, if he does, that he shall continue for one day, one year, or until the minerals developed by the "search" he agreed to make shall be exhausted. Upon the contrary, it is expressly provided that "he shall have the right to abandon said lands and mining at any time, and remove all his buildings from said lands." If we should concede that the technical effect of the words of bargain, sale, and conveyance found in the document was to vest in Colbert title to the mineral and timber interests referred to, without regard to the requirement that he should "enter upon and search for minerals" and should pay the stipulated rent of $10 only when his search shall satisfy him that the interests referred to existed in quantity and quality sufficient to "justify him * * * to open and work them," we could not reconcile the claim that this was a deed of conveyance passing the title, with this clause giving to him the right to abandon a fee in this "nether estate" at his will.

The divestiture of a vested legal title by "abandonment" is unknown at the common law, unless it result from some estoppel or adverse possession under a statute of limitations. 1 Cyc. Law, 6; East Tenn. Iron & Coal Co. v. Wiggin, 68 Fed. 446, 15 C. C. A. 510; Calloway v. Sanford (Tenn. Ch. App.) 35 S. W. 778. Manifestly this agreement obligated Colbert "to enter upon and make search for coal and other minerals." In the absence of a stipulation, he was bound to do this within a reasonable time. If this search developed nothing, the agreement was at an end. The payment of the stipulated sum of $10 per annum is

"to apply on the payment of rent of coal, iron ore, or other minerals or oil, first mined thereafter." Thus the parties regarded this annual payment as an advance rent payment, to continue "until mining is commenced, * * * or during the continuance of this agreement." This payment of rent is also contingent upon another matter, and that is the construction of a railroad. The payment of rent is to be made on request, "within five years after the completion of a railroad in connection with any leading railroad by which said minerals or oils can be taken to any large market." The annual payments provided for after mining should begin are called or described as "rents," a term characterizing the agreement as a lease or license, rather than as conveyance of the mineral interests.

These considerations lead us to the conclusion that the presence of words of conveyance are not sufficient to require us to hold that the effect of the instrument was to vest in Colbert the title to the timber or mineral interests in this land. The ruling intention, as ascertained from all parts of the agreement, should be given effect. It is difficult to believe that it was intended that title should pass until these minerals had been removed and as they were removed. The consideration to be paid could not be ascertained until that contingency arrived, for no price in solido is mentioned. Whether any mining should ever be done or any price ever paid were both dependent upon future events. The contract was, therefore, for a lease dependent upon conditions. That the exploration for minerals should be made within a reasonable time is of the very essence of the agreement, and a condition precedent to the accruing of the right to take the minerals discovered upon the terms of payment indicated. The failure to make such exploration within a reasonable time, and to make it with such thoroughness and certainty as to determine the existence of mineral or oil, would be fatal to the continuance of the agreement. Upon this, we think, this lease depended as a condition precedent. The case falls within the principles applied by this court in the cases of Allegheny Coal Co. v. Snyder, 106 Fed. 764, 45 C. C. A. 604, and Logan Gas Co. v. Grt. Southern Gas Co. (C. C. A.) 126 Fed. 623, and by the Supreme Court of Tennessee in Petroleum Co. v. Coal & Coke Co., 89 Tenn. 38̲, 18 S. W. 65. To the same effect are the cases of Steelsmith v. Gartlan, 45 W. Va. 27, 29 S. E. 978, 44 L. R. A. 107; Conrad v. Moorehead, 89 N. C. 31; Knight v. Coal & Iron Co., 47 Ind. 105, 17 Am. Rep. 692; Huggins v. Daley, 99 Fed. 606, 40 C. C. A. 12, 48 L. R. A. 320.

This duty of exploring for minerals meant for all of the minerals named which might reasonably be expected to be found, considering known geological conditions. The search actually made was not made until 1888 or later, a period of 15 years after the date of the agreement, a delay beyond all reason. When made, it was extremely superficial and valueless from any reasonable view. Coal exposed by washes on side of the mountain was observed, but the depth of the vein, the surface underlain, and character of the coal are as unknown today as upon the day of the lease. No effort seems to have been made to discover iron or coal oil. This kind of an investigation was delusive. The search was a purely nominal one, and not a faithful effort to comply with the

agreement. The Supreme Court of Tennessee, in the case cited above, said of such a requirement in a mining lease:

"The 'testing' should be so thoroughly done as to determine, not only the presence of such minerals, but their commercial value, considering their abundance and accessibility. The information resulting should be such as a prudent and experienced investor would desire to know before expending his capital in the digging of shafts or the erection of machinery proper for the profitable working of such a mine."

Slaven was never notified of even the superficial search made, nor that the lessee proposed to hold on and comply with the terms of the lease. No rent was paid or demanded. No taxes were paid. Not $1 was ever expended in endeavoring to make the lease productive to the lessor. In this situation of things Slaven clearly expressed his intention to avoid the agreement by making a new lease in 1890 to the appellees. Logan Gas Co. v. Grt. Southern Gas Co. (C. C. A.) 126 Fed. 623, 626; Guffy v. Hukill, 34 W. Va. 49, 11 S. E. 754, 8 L. R. A. 759, 26 Am. St. 901; Huggins v. Daley, 99 Fed. 606, 40 C. C. A. 12, 48 L. R. A. 320.

But, independently of any other ground, the general provision of this lease, authorizing the lessee to abandon whenever he should see fit, makes it a lease at the will of the lessee. An estate terminable at the will of one of the parties is determinable at the will of either, though it purports to be terminable at the will of one only. 1 Washburn, Real Property, 371 (side paging); Taylor's Landlord & Tenant, § 14; 18 Am. & Eng. Ency. of Law (2d Ed.) 182.

The decree of the court below is accordingly affirmed.

Following will be found the opinion of the court below:

CLARK, District Judge. For the purpose of determining the questions raised in this case, it is not regarded as important to characterize the instrument, the construction of which is involved, as either a lease or conveyance. It might be called either, and it would not substantially change the rights of these parties. It hardly is to be doubted that the paper operates as a severance of the mineral and surface rights in the tract of land embraced in the lease upon certain conditions, expressed and implied, and it certainly had the effect to vest in the party of the second part, to use the very language of the paper:

"The exclusive right to enter upon said lands at any time hereafter, and search for coal, iron ore, and all other minerals, oils, and salines, and, when found, to remove the same from said lands, together with all rights and privileges incident to the mining and securing said coal, iron ore, clay, and other minerals, oils, and salines, including the right of ingress and egress."

And it at the same time imposed upon that party the obligation:

"To enter upon and make search for coal and other minerals in said lands above described, and, should he find coal, iron ore, or other minerals, or oil, or salines, in said lands and adjoining lands, of sufficient thickness, quantity, and quality to justify him, the party of the second part, to open and work said mines, or oils, or salines, then he, or his representatives or assigns, shall pay to the party of the first part, his heirs or assigns, within five (5) years after the completion of a railroad built in connection with any leading railroad by which said minerals or oils can be taken to any large markets, the sum of ten (10) dollars a year, until mining is commenced upon said premises, or during the continuance of this agreement; and the failure to make these

advanced payments yearly upon request shall be deemed an abandonment of this agreement, but not to the injury of the party of the second part or his assigns."

An instrument like this, as is true of all instruments, must receive a reasonable interpretation, which would give effect to the plain intention of the parties, and not one which would defeat the intention of the parties. The instrument should be so construed as to confer substantial rights on the bargainee, and to furnish a substantial and valuable consideration to the bargainor. It should not be given such an interpretation as would render the paper wanting in mutual obligation, or such as would reduce it to a mere nudum pactum, as declared by Judge Lurton in the case of Petroleum Company v. Coal, Coke & Mfg. Co., 89 Tenn. 381, 18 S. W. 65. The construction must be given in the light of the surrounding circumstances which constituted the situation in which the parties were standing at the time the agreement was made, and such an interpretation must be given as will make the instrument consistent with the view that it is one which a reasonably sensible and intelligent man would have entered into, under the circumstances, and in the light of the situation in which the agreement was made and executed. According to the contention of the defendant, now, at the expiration of 30 years, the instrument is still in full force and effect, conferring upon the bargainee the right, indefinite as to time, which was vested by the agreement when first executed. As the bargainee's contention is, the bargainee now, at the end of 30 years, is vested with the same rights which it possessed when this contract was executed in February, 1873. If at any time in the indefinite future a railroad shall be built sufficiently close by the property to meet the views of the bargainee as to the conditions under which the property can be economically and profitably tested and operated, then for the first time an obligation will rest on it, under the contract, to proceed to test and to operate, or to give notice and abandon. All the right which the bargainors, or their assignees, possess, is to wait and to see whether, during the lifetime of this or any succeeding generation, conditions may arise which will cause the contract to commence yielding to the bargainors, or to the plaintiffs as assignees, a substantial consideration, or a royalty on mining operations, as contemplated when the contract was first entered into.

It is perfectly plain that, if this view can be sustained, it will be equally sound after the lapse of another period of 30 years, or 60 or 90 years. Under such a view clearly the bargainors, or assignees, could receive no benefit during their natural life, and it would be very probable, certainly very possible, that no benefit would accrue within a period of 100 years. It seems to me too plainly evident to admit of serious denial that an interpretation which makes such results possible cannot be sound. It is a construction which in all practical effect, for all practical purposes, implies no legal obligations upon the bargainee, or lessee, to explore, or discover, and to work the mines. It furnishes no substantial consideration to the bargainors, as contemplated by the contract, in the way of royalty on mining operations, and such a construction would convert the instrument into a mere voluntary option on the part of the bargainee to take advantage of this contract, if at

any indefinite time in the future the conditions of that locality make it to its interest to do so. There would, under such a view, be manifestly a gross want of mutuality in the agreement. On the contrary, if the agreement is to be construed as requiring the bargainee within a reasonable time to explore the land, and in the event minerals are found to diligently work the same, and in that way bring to the bargainors a share in the profits of mining operations, the agreement may be regarded as imposing mutual obligations, and as furnishing mutual considerations to support it, but otherwise not. This is the clear doctrine of the case just referred to, which in this respect is in full harmony with the cases of Huggins v. Daley, 99 Fed. 606, 40 C. C. A. 12, 48 L. R. A. 320; Crawford v. Ritchey, 43 W. Va. 252, 27 S. E. 220, and Barnsdall v. Boley (C. C.) 119 Fed. 191.

Now it is in evidence that, at the time the original contract or agreement was made in 1873, the construction of what is now known as the Cincinnati Southern Railway, between Cincinnati, in the state of Ohio, and Chattanooga, in the state of Tennessee, was proposed, and it has in fact since been constructed. There is no doubt that this is one of the circumstances or conditions under which this contract was made, and that under a fair construction of the contract it must be held that this is the railroad referred to in the contract, after the completion of which, and within five years, the full obligations of the contract on the part of the bargainee were in force, and required action on the part of the bargainee, as contemplated by the contract taken as a whole, and such action as would in good faith carry out the clearly implied obligation to proceed; for as was said in Huggins v. Daley:

"There is always an implied, if not an expressed, covenant, for diligent search and operation."

If this be not the true construction, when will there ever be a railroad completed that will put into active operation the obligations resting on the bargainee under such an agreement? It is not to be doubted that leases similar to this have been taken upon bodies of land on either side of the great railway then proposed, and that the number of such leases and tracts of land may run into the hundreds. In the very nature of things, it is certain that there is no probability, or possibility, that third parties constructing railways will ever build them across, or so close to, these tracts of land as to relieve the bargainees of any expenditure or effort on their part to secure lateral or switch tracts reaching mineral property. If the output in mining operations would probably be so great as to induce a railway to build a branch line to any particular tract or tracts of land, this would only result after adequate exploration and development on the part of the bargainee under such a contract, and a showing to some through line of railway that the additional transportation business to be obtained in that way would justify the construction of a branch or spur track to the property thus explored, and which could be profitably operated; but according to the contention of the bargainee the bargainee has at no time been under any obligation to do anything of this kind, but is allowed to stand by and wait until the improbable condition shall arise when a railroad shall be built either on or so close to the tract of land as to require no effort and no expenditure on the part of the bargainee, and in this way the bargainee

is left to take all the speculative chances of the future, with the certainty that the bargainor has completely deprived himself of the power to render his property valuable for productive purposes. It is only necessary to state such a case, with adequate reflection on the grossly inequitable result, to force fair acknowledgment that such an interpretation is utterly unsound. Under this contract both parties took the chance that a railway connecting with the markets of the country would be constructed in the neighborhood of this property, and that when this was done the property would be diligently explored, and if found to justify mining operations, in view of the railroad thus built, whether five or ten miles from the property, or nearer, such mining operations were required to be commenced, and if diligent search for mineral deposits, with the proper test, disclosed that mining operations could not then be conducted profitably, it was an obligation on the part of the bargainee to abandon the enterprise under the contract, surrendering his rights under this agreement, and to notify the bargainor accordingly, and a clearly implied obligation or covenant required it to do this within a reasonable time, in all respects, where the time is not fixed by the written agreement.

In determining whether the property could be profitably developed and mining operations carried on, it was a part of the obligation and the concern of the bargainee to determine in that connection, and as a part of that question, whether such operations could be carried on by procuring or by building a lateral or branch railroad, or, failing in that, by wagon or animal transportation, from this property to the railroad thus completed. But it is clearly not a permissible construction of the contract to say that the bargainee may stand idle, and take no step whatever, and insist that it is not required to take any such step, until and when, if ever that shall happen, a railroad shall by chance be built upon, through, or on a line adjoining the property. What is thus said seems to indicate sufficiently the course of reasoning which I regard as applicable to this case, and by which it is apparent that I reach the conclusion that there has been here a forfeiture and abandonment of the rights conferred upon the bargainee by the agreement in question, by nonuser and by a total failure to comply with the clearly implied covenant requiring diligent exploration and operation on the part of the bargainee; and upon the authority of the cases before referred to I conclude that the bargainor is entitled to the relief sought, and it is so decreed.

This view seems to render it unnecessary that I should consider or decide other points raised in the pleadings and discussed in the arguments at bar.