COCKRUM v. CHRISTY et al. (No. 6201.)

(Court of Civil Appeals of Texas. Austin. May 5, 1920.)

1. **Mines and minerals** ⬅79(4)—**Payment of rent to depository in oil and gas lease held sufficient.**

Where oil and gas lease provided for payment of rental to certain bank, the payment of the stipulated amount to the bank constituted a sufficient compliance with the lease, though lessors refused to accept payment from bank; the bank being the agents of the lessors, and the payment to the bank therefore constituting payment to the lessors.

2. **Mines and minerals** ⬅77—**Oil and gas lease, providing for forfeiture, strictly construed against lessee.**

Contrary to the general rule that forfeitures are not favored in law, the forfeiture of oil and gas lease is so favored, and the lease will be strictly construed against the lessee.

3. **Mines and minerals** ⬅78(1)—**Drilling in good faith with inadequate outfit held not ground for forfeiture.**

Where oil and gas lease required lessee to begin drilling well and prosecute the drilling with due diligence to 2,000 feet if necessary before striking oil, the fact that lessee and his driller might be mistaken in their belief that a 2,000-foot well could be sunk with the drilling outfit with which they began to drill did not warrant forfeiture, unless on ascertaining inadequacy of such outfit he failed to make diligent effort to obtain an adequate drilling outfit.

4. **Mines and minerals** ⬅78(7)—**Evidence held insufficient to prove lack of diligence in drilling well.**

Evidence *held* insufficient to show that lessee who was required by oil and gas lease to begin drilling of well within certain period and prosecute the work with diligence to a depth

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

of 2,000 feet if necessary, was not prosecuting the work with due diligence and in good faith with intention to sink the well begun by him to a depth of 2,000 feet if necessary.

Appeal from District Court, San Saba County; N. T. Stubbs, Judge.

Action between J. V. Cockrum and W. J. Christy and others. Judgment for the latter, and the former appeals. Reversed and remanded.

J. C. Darroch, of Goldthwaite, for appellant.

Walters & Baker, of San Saba, for appellees.

JENKINS, J. On December 4, 1917, appellees leased to appellant a tract of land for the purpose of developing same for oil and gas, the lease to continue for a term of three years. This lease, among other things, provided that the lessee should procure leases upon other tracts of land in the vicinity, and "either to drill a well on this, or such other tract of land, so leased, as he shall elect, not to exceed 7 miles distant from this land, to test said vicinity for oil and gas; said well to be commenced within 12 months from the date hereof and drilled with due diligence to a depth of 2,000 feet, unless oil or gas is found in paying quantities at a lesser depth, and unless hindered and delayed by act of Providence or by physical causes over which lessees have no control, or thereafter forfeit all rights under the terms and provisions hereof, unless further extended in writing by lessor." Said lease contained also the following provision:

"If no well be commenced on said land (the land of appellees) on or before the 4th of December, 1918, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, or to lessor's credit in the City National Bank at San Saba (which shall continue as the depository regardless of changes in the ownership of said land) the sum of $21.75, which shall operate as a rental and cover the privilege of deferring the commencement of a well for 12 months from said date. In like manner, and upon like payments or tenders the commencement of a well may be further deferred for a like number of months successively."

Appellant began a well on the land of Henry Avery, about 3½ miles from appellees' land, August 18, 1918. This well had been sunk to a depth of 700 feet when the suit herein was filed, March 31, 1919. On October 29, 1918, appellant paid to the City National Bank of San Saba, Tex., for appellees the sum of $21.75. The case was tried before the court without a jury, and judgment rendered for appellees.

## Opinion.

[1] We are of the opinion that the payment of $21.75 to the City National Bank at San Saba, to the credit of appellees, was a sufficient compliance with that provision of the lease which required the payment of such rental, notwithstanding the fact that appellees refused to receive the same from the bank. The bank was the agent of appellees, and the payment to it was payment to appellees. Had there been no condition in the lease except that appellant was to begin a well within a specified time and prosecute the same with due diligence, or pay a specified amount as rental, and had appellant begun such well, but appellees were of the opinion that he was not prosecuting the same with due diligence, it would, perhaps, have been the duty of appellees to notify appellant that they would not accept the rental as an extension of the lease. But it will be observed from the findings of fact above set out that the continuance of the lease depended upon the doing of two things by appellant, one of which was to pay the annual rental before the expiration of 12 months from the date of the lease, and the other was to begin a well within 7 miles of appellees' land, and to prosecute work upon the same with due diligence. The court found that appellant did not begin and prosecute work upon such a well as required by the lease contract. If this finding of the court is sustained by the evidence, the judgment should be affirmed.

[2] Contrary to the general rule that forfeitures are not favored in law, the forfeiture of an oil and gas lease is so favored; that is to say, it will be strictly construed against the lessee. Huggins v. Daley, 99 Fed. 606, 40 C. C. A. 12, 48 L. R. A. 320; Monarch v. Richardson, 124 Ky. 602, 99 S. W. 669. From the case last cited, we quote as follows:

"It is true, as said by counsel for appellant, that forfeitures are not generally favored by the law, but forfeitures which arise in gas and oil leases by reason of the neglect of the lessee to develop or operate the leased premises are rather favored because of the peculiar character of the product to be produced. Hence it has been found necessary to guard the rights of the landowner as well as public interests by numerous covenants, some of the most stringent kind, to prevent their land from being burdened by unexecuted and profitless leases incompatible with the right of alienation and the use of the land. Forfeitures for nondevelopment or delay is essential to private and public interest in relation to the use and alienation of property. Perhaps in no other business is prompt performance of contracts so essential to the rights of the parties, or delay by one party likely to prove so injurious to the other. Thornton on the Law Relating to Oil and Gas, § 148; Brown v. Vandergrift, 80 Pa. 142."

Citations of a like nature might be made from numerous other cases.

However well the rights of the landowner should be strictly guarded to prevent parties who are merely seeking to tie up their land

for speculative purposes from holding the same under a lease, without an honest effort to comply with their lease contracts, the rights of a lessee ought not to be ruthlessly disregarded. As stated, the court found that appellant did not begin a well in accordance with the lease contract. This finding can be sustained only upon the theory that his equipment was not sufficient to sink a well 2,000 feet. The facts show that soon after obtaining this lease he purchased in Ft. Worth what is known as an Axtell well-drilling outfit, and that he began the well on the Avery place shortly thereafter. Avery had previously sunk a well on his place about 300 feet, in search for water. He believed that the indications were favorable for oil at that place, and that shallow oil could be developed by sinking that well to a depth of not exceeding 700 feet, and, so believing, he entered into a contract with appellant to pay one-half of the expenses of sinking the well to a depth of 700 feet. This well was only 6 inches in diameter, but appellant reamed the same so as to make it 10 inches in diameter, and sunk the same to a depth of 700 feet.

We infer from the record that appellant shared in the belief of Avery that oil would be found at a depth of 700 feet or less. If such has been the case, he would have complied with his lease contract, for that contract provided for a well 2,000 feet deep, unless oil was found in paying quantities at a less depth. It is, however, apparent from the record that, while Avery was not to share in the expense of sinking the well to a greater depth than 700 feet, appellant expected to continue this well to a depth of 2,000 feet, if necessary. Such was his understanding with Avery when the well was begun, and such was his statement to Avery when the depth of 700 feet was reached.

It may be that the well-drilling outfit procured by appellant was not sufficient for sinking a well 2,000 feet, and the trial judge may have had sufficient expert knowledge on this subject to have so determined, but he was not a witness in the case, and we do not know what his evidence might have been on that point. We must decide this case from the record. The case was not well developed on this point. Two farmers, who stated that they knew nothing about oil well rigs, testified that this rig looked to them like a water well rig, but further testified that they did not know whether or not a well could be sunk with it to a depth of 2,000 feet. An expert should have been called as to this matter.

The court also found that the work was not prosecuted with due diligence. The testimony shows that the well was begun in August, 1917, four months before the time in which appellant was required by the lease to begin the same, and that the work progressed until in October, at which time, by reason of the fact that three strata of water had been struck in the well, it was necessary to reduce the casing, and in order to do this what is known as a swidge nipple had to be procured. Appellant, through a hardware firm at Goldthwaite, ordered this nipple from the parties at Ft. Worth, from whom he purchased the well-drilling outfit. They did not have it on hand, and did not procure the same until about the last of December. In the meantime appellant was constantly urging the hardware firm at Goldthwaite to procure this swidge nipple, and they were urging the parties at Ft. Worth to do so. The excuse given was that, on account of the scarcity of labor and the government demand for iron and steel, they were unable to procure it. The swidge nipple was finally secured, and arrived at Goldthwaite about the last of December. Goldthwaite is in Mills county, on the east side of the Colorado river, and the well on the Avery place was on the west side of the river, in San Saba county, about 10 miles distant from Goldthwaite. The bridge on the river was washed out, and remained impassable for 2 or 3 months, and until the 8th day of February, 1919. At the last-mentioned date, appellant notified the driller who had formerly been in charge of the well that he was ready to resume operations. The driller stated that he was going to Brownwood, and would be absent about a week when he would return and begin work. He did not return at all. Appellant made diligent effort to procure another driller, and succeeded in doing so about the 1st of March. When this driller took charge, he pulled a part of the casing in order to set smaller casing, and his engine got out of fix. Appellant made diligent effort to get the same repaired, and finally had to send the broken piece to the factory, which was received back about the 1st of April, 1919. At this time his igniter got out of fix, and he had to send the same to the factory, and received that on April 19, 1919. As above stated, this suit was filed March 31, 1919.

Appellant testified that he had used as much care and diligence in carrying on the work as he knew how to do, and would have been at work at the time this case was tried, had not this suit been filed.

The last driller employed, Mr. Maybury, testified as follows:

"I live in Goldthwaite, in Mills county. Some time in March I was employed by Mr. Cockrum to drill an oil well in San Saba county, March of this year. We had a No. 28 Axtell drilling rig, and an 11 horse power gasoline engine, I think. The mast pole is 45 feet high, and the derrick is about 60 feet high. We had tools, drilling lines, bits, bailers, and everything that is necessary to drill with, just a general equipment for a drilling rig. When I went out there I first pulled a string of casing, about 572 feet of 6-inch casing. There was some 8-inch casing in the well, but I don't know how much. We

cased off the first water with 8-inch casing. The casing weighs 17 pounds to the foot, and, as there was 572 feet, we pulled a little more than 10,000 pounds with the engine Mr. Cockrum had—at a depth of 2,000 feet the 2,000 feet of three-fourths inch cable and the tools would weigh 3,100 pounds. The difference of 7,200 pounds is what the engine has demonstrated it could pull in addition to the string of tools at that depth. * * * I do not see any reason why Mr. Cockrum should not go down 2,000 feet. Of course, we never know about these things until we go. Mr. Cockrum has extra equipment for handling casing in the way of a derrick over the rig. You could handle casing with that derrick to a depth of 2,000 feet."

[3, 4] Perhaps appellant and also his driller may be mistaken in their belief that a well 2,000 feet can be sunk with this well-drilling outfit, but appellant appears to have acted in good faith as to that matter, and his lease should not be forfeited, even if it should turn out that he is mistaken, unless he fails to make diligent effort to obtain such drilling outfit as will enable him to sink the well to a depth of 2,000 feet. Appellant might have been more diligent in beginning the work after the swidge nipple arrived in Goldthwaite, but such lack of diligence as is shown we do not think is sufficient to indicate that he was not prosecuting the work in good faith, and intending to sink the well 2,000 feet, if necessary.

Appellant has incurred an expense of over $5,000 in the prosecution of work on Avery's land. No oil has been found in San Saba county. It does not appear that any one else desires to lease appellees' land for the purpose of testing for oil. No other well is being sunk in 10 miles of appellees' land, and so there does not appear to be any immediate danger of the oil in his land, if any, being drained therefrom.

For the reasons stated, and in order that the facts of this case may be more fully developed, the judgment of the trial court will be reversed, and this case remanded for a new trial.

Reversed and remanded.