## GILCREASE v. McCULLOUGH et al.

No. 5773—Opinion Filed Oct. 10, 1916.

Rehearing Denied Jan. 9, 1917.

(162 Pac. 178.)

(Syllabus by the Court.)

1. **Indians—Suit to Cancel Oil Lease—Evidence—Records.**

In a suit to set aside an oil and gas mining lease, dated August 24, 1909, on the ground that it was procured by fraud and while plaintiff was a minor, and hence was void under Act May 27, 1908, c. 199, 35 Stat. 312, to prove his minority at that time, plaintiff introduced in evidence the census card, showing that he was nine years old on the date of his enrollment. At the lower right-hand corner of the card appeared: "June 9-99." Held that, as there was nothing on the face of the card to show such was the date of his application for enrollment, the card was without probative force to prove that plaintiff was nine years old on that date.

2. **Same.**

For the purpose of proving his quantum of Indian blood to be one-eighth, plaintiff introduced in evidence a certified copy of the approved rolls of the Creek citizens by blood of the Creek Nation, showing his quantum of Indian blood to be one-eighth. In the certificate thereto was the statement: "Enrolled as of June 8, 1899." Held, that such statement was no part of the record certified and was without probative force to prove the date of plaintiff's application for enrollment.

3. **Same—Validity of Lease.**

In a suit to set aside an oil and gas mining lease for fraud in its procurement, and while plaintiff was a minor in violation of Act May 27, 1908, where the enrollment records fail to disclose the date of enrollment of plaintiff, but the undisputed parol evidence shows him to have been born February 8, 1890, and hence was a minor on August 24, 1909, the date of the execution of the lease, evidence examined, and held, that the court was right in finding there was no fraud in its procurement, but that, aside from the question of fraud, the lease was in violation of the act, and not voidable, but void.

4. **Same—Validity of Second Lease.**

Where a minor citizen of the Creek Nation of one-eighth Indian blood during his minority executes a lease upon his allotment, without the intervention of the county court, and void as in contravention of Act May 27, 1908, and after attaining his majority, without fraud in

its procurement, and for a valuable consideration, executes another lease on the same land to the same party and others interested in the prior lease for a like term, held, that the subsequent lease is good, and that the court did not err in refusing to set the same aside.

## 5. Same—Enrollment Records—Age.

Under Act, May 27, 1908, c. 199, sec. 3 (35 Stat. 313), providing that the enrollment records of the Commissioner to the Five Civilized Tribes shall be conclusive evidence as to the age of an enrolled citizen or freedman, assuming that we can take judicial notice that "June 9-99," appearing on the lower right-hand corner of the enrollment record, was the date of plaintiff's enrollment, and that he was nine years old on that date, such is only conclusive that on said date he had passed his ninth birthday and had not yet reached his tenth, and does not prove that he was a minor on February 8, 1911, the date of the lease sought to be set aside on the ground of minority, which was four months and one day less than 12 years thereafter.

Error from District Court, Tulsa County; A. H. Huston, Assigned Judge.

Action by Thomas Gilcrease against G. R. McCullough and others. There was a judgment for defendants, and plaintiff brings error. Affirmed.

Biddison & Campbell, for plaintiff in error.

James B. Diggs (Henry McGraw and Rush Greenslade, of counsel), for defendants in error.

TURNER, J. On February 12, 1912, in the district court of Tulsa county, plaintiff in error, Thomas Gilcrease, an enrolled citizen of the Creek Nation, alleged to be of one-eighth Indian blood, sued G. R. McCullough, H. B. Martin, A. E. Bradshaw, and Al Brown, to set aside an oil and gas mining lease made, executed, and delivered by plaintiff to McCullough, dated August 24, 1909, on his 160-acre allotment in the Creek Nation. The petition alleged, not only fraud on the part of all the defendants in its procurement, but that plaintiff was a minor at the time, and hence the lease was void. He also alleged that since that time all the defendants, save Bradshaw, while he was yet a minor, still conspiring to defraud him, to wit, on February 8, 1911, procured from him a contract in writing to explore the desired premises for oil and gas, which he likewise assails for fraud, and prays that both lease and contract be set aside and held for naught, and that defendants be required to account for all the oil mined while in possession thereunder and for a receiver, and for general relief.

After separate answers filed, in effect a general denial, there was trial to the court, who held, in effect, that plaintiff was a minor at the time he executed the lease sought to be set aside, but, whether void or voidable

on that account, said lease was expressly adopted by plaintiff after he had reached his majority by the execution of the contract sought to be set aside, and rendered and entered judgment in favor of defendants.

The court was right in holding that plaintiff was a minor at the time of the execution of the lease. To maintain this issue plaintiff introduced in evidence, over objection, a certified copy of the census card for the purpose of showing that plaintiff was nine years old on the date of his enrollment. At the lower right-hand corner of the card appears the following: "June 9-99"—and it is contended that, as there is nothing on the face

of the card to show that this was the date of application for enrollment, the card is without probative force to prove that plaintiff was nine years old on that date. On preceding page there appears a reproduction of the card.

The point is well taken. In McDaniel v. Holland, 230 Fed. 945, 145 C. C. A. 139, the fact was that, before the date located as here on the card, but long after the card had been made out, some one had written, "Date of application for enrollment," and, as the case was not questioned, such the court took said date to be. But here, where it is questioned, and it is insisted that such date, standing alone, is without probative force to prove that such was the date of application for enrollment, we are bound to hold the objection well taken, since we cannot take judicial notice that such date was intended to evidence the date of application for enrollment. And further, since there was no parol evidence introduced to show that such was, in point of fact, the date of application for enrollment, but there was uncontroverted evidence to show that plaintiff was born February 8, 1890, the court did not err when he reckoned plaintiff's age from the latter date, and held that plaintiff was a minor when he, on August 24, 1909, executed the lease sought to be set aside. And he certainly did not err for the reason that, reckoned from either date, plaintiff was a minor on the date in question.

For the purpose of proving his quantum of Indian blood to be one-eighth, plaintiff also introduced in evidence this "card":

"Department of the Interior, Commissioner to the Five Civilized Tribes. Creek Roll. Citizens by Blood.

| Number. | Name. | Age. | Sex. | Blood. | Card. |
|---------|-------|------|------|--------|-------|
| 1505 | Gilcrease, Theo. | (Age 9) 9 | M. | ⅛ | 456 |

"This is to certify that I am the officer having custody of the approved roll of Creek citizens by blood of the Creek Nation, and that the above and foregoing is a true and correct copy of that portion of said roll appearing at number 1505, enrolled as of June 9, 1899, P. O., Leonard, Oklahoma.

"J. G. Wright.
"Commissioner to the Five Civilized Tribes,"

—which, appearing as it does to be a certified copy of the "approved roll," was sufficient proof for that purpose, for the reason that Act May 27, 1908, makes the "rolls of citizenship" conclusive evidence as to the quantum of Indian blood, as distinguished from the "enrollment records," which it makes conclusive evidence as to the age of the plaintiff.

But the recitation, "enrolled as of June 9, 1899," contained in the certificate to this card of the Commissioner to the Five Civil-ized Tribes, was not sufficient to prove that "June 9, 1899" was the date of plaintiff's enrollment. This was held in Jackson v. McGilbray, 46 Okla. 208, 148 Pac. 703. There the court said:

"Plaintiff introduced in evidence a portion of the Creek freedman roll, to wit: 'Department of the Interior, Commissioner to the Five Civilized Tribes. Creek Freedman Roll. No. 852; name, McGilbray, Clarence; age (age nine) 9; sex M., census card, No. 239'—accompanied by the following certificate: 'This is to certify that I am the officer having custody of the approved roll of Creek freedmen, and that the above and foregoing is a true and correct copy of that portion of said roll appearing at No. 852, enrolled as of August, 1898, P. O. Lee, Oklahoma. J. G. Wright. Commissioner to the Five Civilized Tribes, by S. C. Pitts, Clerk.' * * * No date appears in this record itself showing when it was complied. The age of the allottee, Clarence McGilbray, is unquestionably shown therein to be 9 years at some time not stated. When was he 9 years old? When did he reach his majority? These dates it is impossible to determine from the record itself. The court evidently, and necessarily, resorted to, and relied upon, the certificate of the custodian of such records in making its findings, and arrived at the conclusion that the allottee was a minor on July 1, 1910, but was of full legal age one month later. The copy of the portion of the enrollment records offered in evidence is incomplete, and, independently of the certificate of the official in charge thereof, is insufficient to prove age. The office of the certificate is to attest the correctness of that part of the record which is exemplified, and is evidence thereof; but it is no part of such record, nor is it evidence of any fact not appearing in the record proper. As evidence of the fact that it was made in August, 1898, or that the allottee named therein was enrolled as of August, 1898, it was incompetent and without probative force or effect."

The court was also right in holding there was no fraud in the procurement of the instruments assailed. Upon this point there is no material conflict in the testimony. The evidence discloses that plaintiff was a citizen of the Creek Nation of one-eighth Indian blood, was born February 8, 1890, and was married and the owner of the allotment in question. Some time in 1896 his father, acting as his guardian, leased this tract of land for oil and gas mining purposes to one Milliken for 15 years for a bonus of $17,000 and a royalty of one-eighth, who took possession under the lease and bored some 40 or more producing wells thereon. Thereafter, in February, 1909, the district court of Wagoner county, pursuant to the prayer of his petition, rendered and entered a decree purporting to remove plaintiff's disability

of minority and confer upon him his rights of majority (and which it was presumed to do until it was held in Truskett v. Closser, 236 U. S. 223, 35 Sup. Ct. 385, 59 L. Ed. 549 [1915], that such decree was void), whereupon his father was discharged as guardian and plaintiff managed his own affairs. That same year plaintiff moved to Tulsa, where he met the defendant Martin for the first time, and whom he shortly thereafter retained generally as his attorney. While Martin was acting as such, trouble arose between plaintiff and Milliken over the royalty payable to plaintiff, which, when the amount thereof was ascertained, Milliken paid to the Indian agent, who refused to turn it over to plaintiff on account of his minority, whereupon defendant Bradshaw was appointed his special guardian in April, 1910, for the purpose of receiving the same, which he did, and immediately turned the money over to Gilcrease, and was entitled to be discharged. In the summer of 1909, plaintiff, in view of the fact that the Milliken lease would soon expire, wanted to sell another lease on the land, to take effect upon the expiration of the Milliken lease and run for another term of 15 years, and offered to take $10,000 bonus therefor. Hearing this, the defendant Bradshaw asked him what bonus he was receiving from Milliken, and, plaintiff answering, "$17,000," Bradshaw said, "I suppose you will take the same amount for another lease?" to which plaintiff replied that he would. This conversation took place while they were both viewing the leasehold, after which they returned to Tulsa, where plaintiff called next day at the bank, of which Bradshaw was cashier and the defendant McCullough was president, and informed Bradshaw that he was ready to close the deal. After closing the deal, which was talked over between plaintiff, Bradshaw, and McCullough, on request of plaintiff, they went to the office of defendant Martin, who was requested by plaintiff to draw up the papers. This he did by drawing a lease from plaintiff to McCullough, dated August 24, 1909, for a recited cash bonus of $17,000 and a one-eighth royalty, the same to commence at the expiration of the Milliken lease and run for a term of 15 years, or for so long as oil or gas was found in paying quantities. As to the $17,000 bonus, it was agreed between plaintiff and McCullough that $2,000 be paid in cash, which was done, and $500 every 90 days thereafter until McCullough took possession of the demised premises, at which time the balance of the bonus was to be due and payable. After the execution of these instruments, and after the $1,000 cash had been paid, it was discovered that prior thereto plaintiff had conveyed the land in trust to his mother, whereupon McCullough

demanded that the title be cleared, whereupon plaintiff requested the defendant Martin, his attorney, to secure a like lease from his mother to McCullough, which he afterwards did, believing at the time the lease from plaintiff to McCullough to be good.

Under the terms of the Milliken lease, Milliken, at the expiration of his lease, was obligated to leave the casing in all producing wells, but was permitted to remove the other equipment, and also the casing from nonproducing wells. This provision in said lease left it "a gamble" as to the probable value of the property for oil production after the expiration of his lease. And such value was rendered more doubtful, owing to the fact that, as a result of ill feeling between plaintiff and Milliken, the latter had declared that he did not want to lease the property after his lease expired, for the reason it would be of no value as an oil property, and, to render it so exerted himself to destroy it as such by shooting the wells with charges of explosives many times too large, in order to exhaust the oil, so as to render them nonproducing, and thereby afford him the right to remove the casing and other equipment from the property at the expiration of his lease. Thus matters stood at the time of the execution of the lease in question from plaintiff to McCullough, at which time the amount of bonus which would be fair to pay for it varied, in the opinion of the witnesses who testified on that point, from $200,000 to $15,000, while others testified that the value of the lease was a pure gamble, and not a marketable proposition at all. And thus matters stood for about a year thereafter, at which time, as only a few months intervened until McCullough had the right to take possession under his lease, and oil, in the meantime, had greatly advanced in price, and the condition of the wells was such as to justify the presumption of indefinitely continued profitable production, and hence the property had greatly appreciated in value, plaintiff approached McCullough to buy back from him a fourth interest in the lease. It might be well to pause here and say that the evidence reasonably tends to prove that the bonus paid for this lease was a fair one under all the circumstances, and that there is a total absence of fraud in the procurement of said lease.

The negotiations which followed resulted, on October 22, 1910, in the assignment by McCullough to plaintiff of a one-fourth interest in the lease for $15,000, and also an assignment of McCullough to Martin of a one-fourth interest therein for a like amount. And as McCullough, since the making of the lease of August 24, 1909, had paid plaintiff $4,000 of the consideration therefor, leaving

a balance due plaintiff of $13,000 plaintiff paid for the one-fourth interest so purchased, by taking credit for his payment of said $13,000, and by paying $2,000 in cash. Martin purchased his one-fourth interest in the lease at the request of plaintiff, and settled for it in a way not necessary here to state, but which was perfectly fair; and, as it was satisfactory to McCullough, no one else need complain. On February 8, 1911, the day the Milliken lease expired and plaintiff reached his majority, plaintiff, McCullough, and Martin made and entered into the following:

### "Contract.

"This indenture, made and entered into this 8th day of February, 1911, by and between Thomas Gilcrease, G. R. McCullough, and H. B. Martin, witnesseth: That for and in consideration of the mutual covenants and agreements hereinafter contained, the parties hereto contract and agree that the said Thomas Gilcrease, G. R. McCullough, and H. B. Martin, their respective heirs, administrators, and assigns, shall have and hold, in the proportions hereinafter described, the exclusive right to mine oil and gas from and upon the premises hereinafter described, to wit: The south one-half ($\frac{1}{2}$) of the northwest quarter ($\frac{1}{4}$) and the north one-half ($\frac{1}{2}$) of the southwest quarter ($\frac{1}{4}$) of section twenty-two (22), township seventeen (17) north, range twelve (12) east of the Indian meridian, in the county of Tulsa and state of Oklahoma, as long as oil and gas, or either of them, are found upon said premises in paying quantities. The said Thomas Gilcrease shall receive as royalty for said leased premises one-eighth ($\frac{1}{8}$) of all the oil mined and saved upon said premises, delivered in pipe line, and such royalty shall be paid at any time after the sale of such oil, upon demand of the said Thomas Gilcrease. And in addition to said royalty the said Thomas Gilcrease, his heirs, executors, and assigns, shall have and hold an undivided one-fourth ($\frac{1}{4}$) of the leasehold interest in said property; The said G. R. McCullough, his heirs, administrators, and assigns, shall have and hold an undivided one-half ($\frac{1}{2}$) of the leasehold interest in said land; and the said H. B. Martin, his heirs, administrators, and assigns, shall have and hold an undivided one-fourth ($\frac{1}{4}$) of the leasehold interest in said land.

"And it is further contracted, covenanted, and agreed that the parties hereto, their heirs, administrators, and assigns, shall operate said lease for oil mining purposes from this date as long as oil and gas is found thereon in paying quantities, and that after the payment of the royalty hereinbefore provided for to the said Thomas Gilcrease, that all of the balance of the proceeds of the oil produced from said leased premises, less necessary operating expenses, shall be applied to the payment of the cost of equipment of said lease until such equipment shall have been fully paid for out of said proceeds. And it is further contracted, covenanted, and agreed that the equipment now upon said leased premises, and hereafter to be placed upon said leased premises, shall be and remain the personal property of the said Thomas Gilcrease, G. R. McCullough, and H. B. Martin, their heirs, executors, and assigns, in the proportion of the interests of said parties in said leasehold, as evidenced by this contract. And it is further covenanted, contracted, and agreed that the said parties shall not remove any of said equipment, including powers, engines, tanks, lead pipes, houses, tubing, rods, casings or any other portion of said equipment from any wells upon said leased premises as long as oil is produced from said wells in paying quantities, but that when such wells shall become exhausted, and no longer produce oil in paying quantities, then such equipment may be removed by said parties hereto, their heirs, administrators, and assigns. And it is further covenanted and contracted that the expenses of operation of said leased premises for mining purposes shall be paid by the parties hereto in the proportion of their respective interests as hereinbefore described, except that the royalty interest of the said Thomas Gilcrease shall not be liable for any of the expense of the equipment or operation of said lease, and shall be free from any expenses whatever.

"In witness whereof, we have hereunto set our hands this 8th day of February, 1911.

"Thomas Gilcrease.
"G. R. McCullough.
"H. B. Martin."

"In witness whereof, we have hereunto set the parties.

While the evidence fails to disclose just what interest the defendants Bradshaw and Brown have in said lease, it does disclose that, whatever that may be, the same is included in the one-half interest of McCullough. It further shows that soon after the execution of said contract the parties thereto took possession of the premises therein described, but before they could produce oil were compelled to replace that part of the equipment which Milliken had removed in the way of pumps, apparatus, power, rods, casing, etc., after which they proceeded to operate the property under said contract and to market the oil produced. It seems that this new equipment was obtained at a cost of some $60,000, and mostly upon the credit of McCullough through arrangements with supply companies, and eventually paid for by installments out of the proceeds of the sale of oil, after which operating expenses were paid and the remainder divided among the parties as their respective interests appear in the contract. It also seems that such production was considerable, as a result of which opera-

tions were conducted upon the basis mentioned up to the time this suit was brought; the pipe line company paying the parties in interest for the oil upon division orders signed by them, which, when obtained, they turned back into a fund out of which was paid the operating expenses and the installments due upon the equipment. In July following, the defendant Martin, in the presence and with the knowledge of plaintiff, in settlement with his law partner, extinguished his partnership claim to the interest of Martin in the contract for $12,500. On December 11, 1911, plaintiff and Martin had a general settlement of their affairs, whereupon Martin assigned to plaintiff three-fourths of his one-fourth interest in the premises. And thus matters stood at the time this suit was brought.

From all of which we fail to see any fraud whatever in the procurement of either or both of the instruments assailed. Certainly there is nothing upon which to base the charge that the defendant Martin was guilty of fraud and of overreaching his client from start to finish. He was the mere scrivener in preparing the lease of August 24, 1909, and that, too, at the request of Gilcrease. Although he was at that time his attorney under general retainer, he was not consulted as to the advisability of executing the lease, much less as to the fairness of the bonus to be paid therefor. All parties in interest thereto made the agreement thereby expressed without his knowledge, much less by his advice. His sole connection with that matter was to reduce the lease to legal form, which he did, believing that plaintiff was competent to enter into the contract. And such it seems was the belief generally among lawyers, until Jefferson v. Winkler, 26 Okla. 653, 110 Pac. 755, was decided. Nor is there any evidence that his subsequent interest in the property was acquired other than in good faith and for value.

We also fail to see that a fiduciary relation existed between him and Bradshaw, as special guardian for plaintiff at the time of the execution of said lease or the subsequent contract; this for the reason that, if such relation arose out of the fact of the qualification of Bradshaw as special guardian in April, 1910, for the purpose of receiving royalties due plaintiff from the Indian agent, such relation had not arisen at the time of the execution of the lease, and had long since ceased to exist at the time of the execution of the contract by the performance of the trust. All that can fairly be said concerning the circumstances of these transactions is that here is a minor, the owner of certain oil lands of doubtful value, subject to a lease of 15 years, about to expire. He has received a sum certain as a bonus for the existing lease, and offers to lease the land again for the same term, to any one who will buy. The original lessee would not have it, and intended to remove his equipment from the leasehold at the expiration of his term, thereby necessitating a re-equipment of the wells at a cost of thousands of dollars by a subsequent lessee in order to render them producers. He does so by the lease of August 24, 1909, to take effect at the expiration of the prior lease, and, so far as we can see, drives a good bargain. As the end of the existing term approaches, and oil goes up, and production increases, and he sees the value of the lease appreciate, he goes to the second lessee and seeks to buy back an interest in the lease. Although he has not taken possession under his lease or expended a dollar thereon, the second lessee had the right to set his own price on his property, and accordingly priced a one-fourth interest in the lease at precisely what the minor had sold the whole lease for. He was within his rights, and the minor had a right to accept or reject it. He accepted, and, having theretofore received $4,000 of the bonus agreed to be paid for the lease, paid the $15,000 for a fourth interest in the lease by foregoing the $13,000 and by paying $2,000 as stated. This may or may not have been wise on his part. With that we have no concern. His subsequent reinvestments in the lease may also not have been wise. With these we have no concern. It is sufficient to say we see, perhaps folly, but no fraud in any of them. We see, further, that this minor, now that he has reacquired, aside from a royalty of one-eighth in the lease, six-sevenths of the leasehold, and, after the property under the contract of February 8, 1911, has been re-equipped and is yielding large returns upon the investment, is seeking to set aside both contract and lease and reacquire the whole property, and that, too, although he entered into that contract after reaching his majority, and thereafter induced large expenditures of money on the strength of it, and accepted large benefits on account of it; and the question before us is whether the court erred in refusing to permit him so to do.

Plaintiff insists that his lease of August 24, 1909, made during his minority, was void as in violation of Act May 27, 1908. This point is well taken, and it has been so held by us ever since Jefferson v. Winkler, 26 Okla. 653, 110 Pac. 755. In that case a minor Creek girl married, and, after the passage of said act, conveyed a portion of her allotment. Thereafter, pursuant to an order of the county court, her guardian sold her allotment to another. In a contest over the land between the two grantees the court, in effect, held that, while said act removed all her restrictions, it, at the same time, passed the minor

and her allotment under the jurisdiction of the probate courts of the state, which alone had power to sell her allotment, and hence her conveyance thereof was, not voidable, but void. In summing up the act, the court said:

"In other words, construing all of the foregoing provisions of said act together, we think it was the legislative intent to provide that the allotted lands of freedmen and mixed-blood Indians having less than half Indian blood, under the age of 18, if a female, and under the age of 21, if a male, may be sold under the supervision and jurisdiction of the probate courts of the state, and not otherwise. It therefore follows that, since Rebecca Johnson was not 18 years of age at the time she conveyed the land in controversy to defendant in error, and the sale to him was not made under the supervision and order of any probate court of the state, he acquired no title thereby, and has not sufficient interest in the lands in controversy to entitle him to maintain this action."

Of course what is there said concerning a sale would be true of a lease executed by a minor in violation of the act. It would also be void, and not voidable. In Truskett v. Closser, supra, the Supreme Court, in reviewing that case, construed it to hold that the lease under consideration was void. This was also our holding in Tirey et al. v. Darneal, 37 Okla. 606. 133 Pac. 614. and in Reid v. Taylor, 48 Okla. 816. 144 Pac. 589. This question was also squarely decided in Barbro et al. v. Hood. 228 Fed. 658. 143 C. C. A. 180. by Hook. Circuit Judge. The suit involved the title to 20 acres of land in Nowata county. a part of the surplus allotment of a minor Cherokee freedman. Both appellants and appellee claimed under the allottee —the former by a deed dated April 23. 1910. when he was a minor under the age of 21 years; and the latter by a similar deed, dated September 3, 1910. when he was of full age. The question presented was whether the first deed, made by the allottee during his minority, in contravention of the act in question. was void, or merely voidable. In passing, the court said:

"The deed of the allottee, executed when he was a minor, and not by a guardian acting under the authority of the court having jurisdiction, is void."

See, also, McDaniel et al. v. Holland, 230 Fed. 945. 145 C. C. A. 139.

The court was also right when he held, in effect, that plaintiff was bound by the terms of the contract of February 11, 1911, and refused to set it aside, and rendered and entered judgment for defendants; this for the reason that said contract is, in effect, not a ratification of the lease of August 24. 1909, but a new lease, and an independent transaction for a valuable consideration,

made after he became of age. We say it was, in effect, a lease, for the reason that the intent of the parties thereto to thereby execute a lease appears upon its face; and the intent of the parties, as gathered from its face, must characterize the instrument. Or, in the words of Justice Lurton in Tennessee Oil Co. v. Brown, 131 Fed. 696, 65 C. C. A. 524, speaking to this precise point:

"The ruling intention, as ascertained from all parts of the agreement, should be given effect," in determining whether or not the instrument under construction is a lease.

As to the rules of construction, in Branch v. Doane, 17 Conn. 401, it is said:

"There is no doubt that any words which are sufficient to denote the intention of the parties that one shall divest himself of the possession of land, and the other come into it, are enough to constitute, and will in legal construction amount to, a lease, as effectually as if the most apt and pertinent words had been used for that purpose, provided the transaction does not want, in any other respect, the constituents necessary to make a lease; and it is immaterial whether the words are in the form of a license, covenant, or agreement. Bac. Abr. tit. Leases, etc., K; Evans v. Thomas, Cro. Jac. 172; Hall v. Seabright, 1 Mod. 14. Thus, if one license another to enjoy such a house or land from such a time to such a time, it is a lease. Bac. Abr. ubi supra. So if one 'license' another to inhabit, or to come upon his dock and carry on his trade, it amounts to a lease. Right d. Green v. Proctor, 4 Burr. 2209; Anon., 11 Mod. 42. But such language does not necessarily, and independent of anything more to show that there was a contract between the parties, constitute a lease. A lease is more than a mere license; it is a contract for the possession and profits of lands and tenements on the one side, and a recompense of rent or other income on the other; or, in other words, a conveyance to a person for life, or years, or at will, in consideration of a return of rent or other recompense. 4 Cruise's Dig. 67; Jackson d. Webber et al. v. Harson et al., 7 Cow. 326; 3 Blk. Com. 317. If, therefore. the words, whatever they may be. which confer authority to another to take possession of land, are not accompanied with language or stipulations which evince such a contract between the parties, they would amount to a mere license. * * *"

In Haywood v. Fulmer et al., 158 Ind. 658, 32 N. E. 574, quoting approvingly the court said:

" 'A lease is a contract by which one person divests himself of, and another takes the possession of, lands or chattels for a term, whether long or short.' Wood, Landl. & Ten., sec. 203. * * * 'A lease is a species of contract for the possession and profits of lands and tenements, either for life, or a certain term of years, or during the pleasure of the

parties.' 12 Amer. & Eng. Enc. Law, tit. 'Lease,' 976. * * * 'No precise form of words is necessary to make a lease. Any written instrument expressing the agreement of the parties, signed by one and accepted and acted upon by the other, will be obligatory upon both.' Alcorn v. Morgan, 77 Ind. 184. In the case from which we quote the foregoing, the written instrument, which the court there held to be a written lease, was in form a receipt, but contained independent stipulations sufficient, in the opinion of the court, to make it also a contract. A lease may not only confer upon the lessee the right to the occupancy of the leased premises, either generally for the time limited, or for some specific purpose, or in some specific manner, or the right to occupy and cultivate, and to remove the products of cultivation; but it may confer upon him the power to occupy and remove a portion of that which constitutes the land itself. Familiar and common examples of such leases are those authorizing the lessee to quarry and remove stone, to open mines and remove ores, minerals, mineral coal, etc., or to sink wells for procuring and removing petroleum and natural gas."

Tested by these rules, the instrument under construction possesses every element of a present lease. When it says, as it does, that the parties hereto contract and agree that each of them shall have and hold, in the proportions thereinafter described, the exclusive right to mine oil and gas from and upon certain lands therein described, it means that each of them may enter and take possession of those lands and hold them in joint possession for that purpose. This, then, is a contract for the possession of lands. And when it further says that they shall have the exclusive right to mine as long as oil and gas, or either of them, are found upon said premises in paying quantities, it fixes a certain term, or, what is the same thing, one capable of being made certain, and thereby supplies another element of a lease. And when the lease further provides that plaintiff shall receive "as royalty for said leased premises one-eighth of all oil mined and saved upon said premises," it supplies the remaining element, which is rent or recompense to the lessor or owner of the land. Moreover, as additional compensation to plaintiff, it is further agreed that plaintiff "shall have and hold an undivided one-fourth of the leasehold interest in said property," which by "leasehold interest" is meant one-fourth of the right to mine for oil and gas, or, in other words in addition to his royalty, should receive as recompense one-fourth of the oil produced upon the demised premises. It is unnecessary to say more to bring the instrument within every definition of a lease; but we will add: As the intent in making the instrument is to govern in characterizing it, here is one which shows upon its face the intent to be to make a lease, when it speaks of the lands therein described as the "leased premises," of the interest conveyed as a "leasehold interest," and hence we hold the instrument to be a lease, and so, in effect, declared to be upon its face.

United States v. Gratiot et al., 14 Pet. 526; 10 L. Ed. 573, was a suit against the sureties on a bond given for the faithful execution of a license given their principal, with the approbation of the President of the United States, to purchase and smelt lead ore at the United States lead mines on the Upper Mississippi for a period of one year from the date thereof. The question certified to the court was whether the President had power under a certain act of Congress to make the contract set forth in the declaration. That question turned upon the further question of whether the contract was a lease within the meaning of the act. The court said:

"This contract purports to be a license for smelting lead ore; and it is objected that this is not a lease, within the meaning of the act of Congress. But this objection is not well founded. It is a contract for one year, and, of course, within the time limited by the law, which gives to the President authority to lease for five years. Is it, then, a lease? The legal understanding of a lease for years is a contract for the possession and profits of land, for a determinate period, with the recompense of rent. The contract in question is strictly within this definition. * * * This contract is for the possession of land. The work is to be performed at the United States lead mines, and must, of course, be performed within the limits prescribed by law to be attached, to such mines. And there is an express permission to use as much fuel as is necessary to carry on this smelting business, and to cultivate as much land as will suffice to furnish teams, etc., with provender; and there is an express reservation of the rent of 6 pounds of every 100 pounds of lead smelted, with special and particular stipulation for securing the same. It is not necessary that the rent should be in money. If received in kind, it is rent, in contemplation of law."

In Moore v. Miller, 8 Pa. 272, in one of the headnotes it is said:

"In estimating the language which constitutes a lease, the form of words used is of no consequence; it is not necessary that the term 'lease' should be used. Whatever is equivalent will be equally available, if the words assume the form of a license, covenant, or agreement, and the other requisites of a lease are present."

See, also, Asher v. Johnson, etc., 118 Ky. 702, 82 S. W. 300; Pelton v. Minah Con. Min. Co., 11 Mont. 281, 28 Pac. 310; Horner v. Leeds, 25 N. J. Law, 106; Watson v. O'Hern,

6 Watts (Pa.) 362; Wilcox v. Bostick, 57 S. C. 151, 35 S. E. 496; Munson v. Wray, 7 Blackf. (Ind.) 403.

This lease, having been executed upon attaining his majority, under circumstances free from fraud, and not for a part, but for a consideration to be paid, "or for and in consideration of the mutual covenants and agreements hereinafter contained," which were, among others:

"And it is further covenanted and contracted that the expenses of operation of said leased premises for mining purposes shall be paid by the parties hereto in the proportion of their respective interests as hereinbefore described, except that the royalty interest of the said Thomas Gilcrease shall not be liable for any of the expense of the equipment or operation of said lease, and shall be free from any expenses whatever," —but that he would bear his share of the expense of equipment in such proportion as his interest appeared in the lease, we see no reason why plaintiff should not stand by it.

In McKeever v. Carter et al., 53 Okla. 360, 157 Pac. 56, a minor Creek freedman had conveyed or entered into a contract to convey his land in contravention of Act May 27, 1908, which the court held was void. Almost immediately on attaining his majority, without fraud or undue influence, he made a deed to the land which the court held to be valid. After reviewing the act and the holdings of this court construing same, the court said:

"In the light of these authorities it would seem that, even though the agreement to convey the land entered into by plaintiff with defendant while plaintiff was a minor was void, and that same could not be enforced, had plaintiff declined to perform the same, yet there was no legal impediment in the way of plaintiff conveying his lands to any grantee he chose after reaching his majority, and upon any legal consideration which he saw fit to accept. * * * * * * There is not the slightest evidence in the record tending to impeach the deeds of August 9th and August 31st, other than the fact that an agreement had been made by plaintiff while a minor to convey his lands to defendant. There is no evidence of coercion, undue influence, or other grounds of equitable interference that would impeach either of said two last-named conveyances. and, if plaintiff was on the date of their execution an adult, he was capable in law of conveying said lands to whomsoever he chose, for any lawful consideration, and could, if he saw fit, give said lands away; and, when he executed and delivered these deeds and accepted the consideration, said deeds were valid and binding conveyances, and operated to transfer plaintiff's title to the grantee therein named, provided he had then reached his majority."

And plaintiff was of age when, on February 8, 1911, he made the second lease. Not only was this the presumption, but such was established by the undisputed parol evidence. But, aside from this, assuming that we can take judicial notice that June 9, 1899, was the date of his enrollment, and that the census card so shows, and that he was 9 years old on that date, such is only conclusive that on said date he was in his ninth year, or had passed his ninth birthday and had not yet reached his tenth, and hence, does not prove that he was a minor on February 8, 1911, which was 4 months and 1 day less than 12 years thereafter. This is in keeping with what we held in Heffner v. Harmon, 60 Okla. 153, 159 Pac. 650, where on this point we followed McDaniel v. Holland, supra, and in the syllabus said:

"Under Act May 27, 1908, c. 199, sec. 3, 35 Stat. 313, providing that the enrollment records of the Commissioner to the Five Civilized Tribes should be conclusive evidence as to the age of an enrolled citizen or freedman, the enrollment record, giving the age of an Indian as 9 years, is conclusive that on that date he had passed his ninth birthday and had not yet reached his tenth, but is not conclusive that he was exactly 9 years of age on that day, and does not establish that he was a minor when he made a conveyance of land one month less than 12 years thereafter."

We are therefore of opinion that the judgment of the court was right, and should be affirmed. It is so ordered.

All the Justices concur, except KANE, C. J., absent and not participating.